1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          ykrivoshey@bursor.com
          breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA BLACK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., and FISHER-PRICE, INC.,<br><br>Defendants. | Case No.  2:19-cv-03209<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Linda Black ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendants Mattel, Inc. ("Mattel") and Fisher-Price, Inc. (Fisher-Price") (together, "Defendants") for the manufacture, marketing, and sale of Fisher-Price Rock 'n Play Sleepers identified below.  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF ACTION

1.      This is a class action against Defendants Mattel, Inc. and Fisher-Price, Inc. for the manufacture and sale of Fisher-Price Rock 'n Play Sleepers (the "Rock 'n Play Sleeper" or the "Sleeper") all of which were marketed as suitable for all night and/or prolonged sleep.  The Rock 'n Play Sleeper is an inclined infant "sleeper" that is advertised as such.  The name "sleeper" is prominently displayed on the boxes in which the Sleepers are sold.  Additionally, other materials used to promote the Sleepers exclaim, "Baby can sleep at a comfortable incline all night long!" and make similar statements about its fitness for nighttime sleep. This marketing was dangerously false and misleading, as the product is not safe for all-night or prolonged sleep for infants.

2.      The Rock 'n Play Sleeper is inherently unsafe as a sleeper and unfit for its intended use.  Its use poses a number of serious safety risks that have led to many documented instances of infant deaths and injuries.  By positioning an infant at a 30-degree incline, the Rock 'n Play Sleeper significantly increases the risk that the infant's head will slip into a dangerous position, tilt to constrict the windpipe and/or cause the infant's face to become pressed against the padded fabric in the sleeper and block airflow, which the infant may be unable to correct. This increases the risk of death by asphyxiation.  In addition, because Defendants advise parents to keep babies strapped in restraints overnight while sleeping on an incline, the Rock 'n Play Sleeper increases the infant's risk of developing flat head (plagiocephaly) and

twisted neck (torticollis) syndromes, conditions that often require babies to wear expensive head-molding helmets and undergo physical therapy.

3.    Defendants knew about these risks for as long as they sold the Rock 'n Play Sleeper. Among other things, (1) the American Academy of Pediatrics ("AAP") and major consumer groups repeatedly issued warnings about the serious dangers of inclined sleepers; (2) due to these known dangers, regulators in Canada and Australia did not allow Defendants to sell the Rock 'n Play Sleeper in their countries as a "sleeper"; (3) Defendants have already been sued for at least one infant death in a Rock 'n Play Sleeper; (4) at least 32 infant deaths have occurred using the Rock 'n Play Sleeper; and (5) upwards of 700 injuries have been reported due to the use of inclined sleepers, including the Rock 'n Play Sleeper.  Ignoring documented safety concerns and in pursuit of profit, Defendants continued to market and sell the Rock 'n Play Sleeper in the United States as an infant sleeper that is suitable for all night and prolonged sleep.

4.    On April 5, 2019, the Consumer Product Safety Commission ("CPSC") and Fisher-Price issued a joint news release acknowledging that ten infants have died while in the Rock 'n Play Sleeper since 2015, and warning consumers to stop using the Sleepers once the infant reaches three months of age or as soon as the infant exhibits rollover.[1]  The news release stated:

> The Consumer Product Safety Commission (CPSC) and Fisher-Price *warn consumers about the Fisher-Price Rock 'n Play due to reports of death when infants roll over in the product*.  According to medical literature, infants typically begin rollover behaviors at 3 months.  The CPSC is aware of 10 infant deaths in the Rock 'n Play that have occurred since 2015, after the infants rolled from their back to their stomach or side, while unrestrained.  All 10 infants were 3 months or older.

---

[1] https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product (last visited Apr. 23, 2019).

1
2
3
4
5
6
7
8
9
10

> *Because deaths continue to occur, CPSC is recommending consumers stop use of the product* by three months of age, or as soon as an infant exhibits rollover capabilities.  CPSC has previously warned consumers to use restraints in infant inclined sleep products.
>
> Fisher-Price warns consumers to stop using the product when infants can roll over, but the reported deaths show that some consumers are still using the product when infants are capable of rolling and without using the three point harness restraint.
>
> CPSC and Fisher-Price remind consumers to create a safe sleep environment for infants, whether using a crib, bassinet, play yard, or inclined sleeper: Never add blankets, pillows, stuffed toys, or other items to the environment and ***always place infants to sleep on their backs***.

11

(Emphasis added).

12

     5.     Later on April 5, 2019, shortly after the joint CPSC/Fisher-Price

13

announcement, Mattel issued a press release,[2] which stated in relevant part:

14
15
16

> Today, Fisher-Price® and the U.S. Consumer Product Safety Commission (CPSC) jointly issued an alert warning parents and caregivers to discontinue use of the Rock 'n Play Sleeper when infants begin to roll over.

17
18

> In response to the alert, Fisher-Price released the following additional statement:

19

> A child fatality is an unimaginable tragedy.

20
21
22
23

> ***Fisher-Price has a long, proud tradition of prioritizing safety as the cornerstone of our mission***. Generations of parents have trusted us for almost 90 years to provide safe products for their children. We are there with you from the moment you bring your child home and take our responsibility for product safety very seriously.

24
25
26
27

> Today, the Consumer Product Safety Commission (CPSC) and Fisher-Price have jointly issued an alert warning parents and caregivers to discontinue use of the Rock 'n Play Sleeper when infants begin to roll over. To ensure a safe sleep environment for infants, we remind parents and caregivers to follow all

28

---

[2] https://mattel.gcs-web.com/news-releases/news-release-details/media-statement-us-consumer-product-safety-commission-fisher (Last visited Apr. 23, 2019).

safety warnings included with the product: always use the provided restraints, always place infants on their backs to sleep, and make sure that no pillows, blankets or extra padding are placed in the Rock 'n Play Sleeper. ***The Rock 'n Play Sleeper meets all applicable safety standards***, including those of the international standards organization, known as ASTM International, and is certified by the Juvenile Products Manufacturers Association (JPMA).

Fisher-Price and every one of our employees take the responsibility of being part of your family seriously, and we are committed to earning that trust every day.

(Emphasis added).

6.    Despite announcing that at least ten babies died from the use of Defendants' product and issuing a warning to consumers, Chuck Scothon, general manager of Fisher-Price, issued a statement on April 5, 2019 reassuring consumers that the Sleepers **meet all applicable safety standards**.[3]

7.    On April 8, 2019, Consumer reports described the results of an investigation into the sleepers, which found that the Sleeper is tied to at least 32 infant deaths.[4]  Consumer Reports noted that the Sleeper "has not been recalled by Fisher-Price, part of the children's products giant Mattel, which had about $4.5 billion in sales in 2018.  The deaths prompted only warnings by the company and the CPSC, which does not have a mandatory safety standard for infant reclined sleep products."  Consumer Reports further stated that "the number of incidents associated with the Rock 'n Play Sleeper, combined with long-standing expert medical advice that babies should sleep on firm, flat surfaces, raises serious safety concerns about the product."

---

[3] https://www.cnn.com/2019/04/05/health/fisher-price-rock-n-play-sleeper-warning/index.html (last visited Apr. 23, 2019).
[4] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited Apr. 23, 2019).

8.    On April 9, 2019, the AAP issued a press release calling on the CPSC to recall the Rock 'n Play Sleeper and urging parents and consumers to stop using the Sleepers immediately.[5]  The press release stated in relevant part:

> AAP urges parents to stop using the product immediately. Stores should remove the Rock 'n Play Sleeper from their shelves. A warning issued by the CPSC and Fisher-Price on April 5 did not go far enough to ensure safety and protect infants, according to the AAP.
>
> "This product is deadly and should be recalled immediately," said Kyle Yasuda, MD, FAAP, president of the American Academy of Pediatrics. ***"When parents purchase a product for their baby or child, many assume that if it's being sold in a store, it must be safe to use. Tragically, that is not the case. There is convincing evidence that the Rock 'n Play inclined sleeper puts infants' lives at risk,*** and CPSC must step up and take immediate action to remove it from stores and prevent further tragedies."
>
> Last week, the CPSC and manufacturer alerted consumers to stop using the product when the infant reaches 3 months of age or is capable of rolling over, citing 10 infant deaths that occurred in the Rock 'n Play. The Consumer Reports article, published April 8, tied a total of 32 deaths to the Rock 'n Play, including the 10 noted in last week's warning.
>
> Consumer Reports concluded that these 32 deaths, between 2011 and 2018, included babies even younger than the 3-month threshold cited in the initial warning, which is alarming. The cause of death listed for some babies was asphyxia, or the inability to breathe caused by the babies' position. ***AAP urges parents of children of all ages to immediately stop using the Rock 'n Play.***
>
> "We cannot put any more children's lives at risk by keeping these dangerous products on the shelves," said Rachel Moon, MD, FAAP, chair of the AAP Task Force on SIDS. "The Rock 'n Play inclined sleeper should be removed from the market immediately. It does not meet the AAP's recommendations for a safe sleep environment for any baby. Infants should always sleep on their back, on a separate, flat and firm sleep surface without any bumpers or bedding."

---

[5] https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Urges-U-S-Consumer-Product-Safety-Commission-to-Recall-Fisher-Price-Rock-n-Play-Sleeper.aspx (last visited Apr. 23, 2019).

***The AAP does not recommend inclined sleep products like the Rock 'n Play,*** or any other products for sleep that require restraining a baby. The AAP advises against using car seats, strollers or other devices for sleep because of the risk that a baby could roll or turn into an unsafe position and be incapable of moving, leading to suffocation or strangulation.

(Emphasis added).

9.    Finally, on April 12, 2019, after warnings from the CPSC and other agencies and groups as described herein, Defendants recalled approximately 4.7 million Sleepers in the United States.

10.    Had Plaintiff and other members of the putative class been aware of the dangers and risks posed by the Sleepers, which render them unfit for use, they would not have purchased them.

11.    Plaintiff brings claims against Defendants individually and on behalf of a class of all other similarly situated purchasers of the Sleepers for (1) fraud; (2) unjust enrichment; (3) breach of implied warranty; and (4) breach of express warranty.

## PARTIES

12.    Plaintiff Linda Black is, and at all times relevant to this action has been, a resident of Palestine, Texas.  In or around October 2018, Ms. Black purchased Defendants' Rock 'n Play Sleeper from a Walmart store located in or near Palestine, Texas.  Before purchasing the Sleeper, Ms. Black saw, read, and relied on Defendants' representations that the Sleeper was suitable for prolonged or overnight sleep for infants.  Ms. Black would not have purchased the Sleeper had she known that there was a significant risk that the Sleeper was dangerous and unfit to perform its intended purpose.

13.    Defendant Mattel, Inc. is a Delaware corporation with its principal place of business at 333 Continental Boulevard, TWR 15-1, El Segundo, CA 90245. Mattel is multibillion-dollar company focused on children's products.  Mattel

manufactures, markets, and distributes the Rock 'n Play Sleepers throughout the United States.

14.     Defendant Fisher-Price, Inc. is a Delaware corporation with its principal place of business at 636 Girard Avenue, East Aurora, New York 14052.  Fisher-Price is a wholly-owned subsidiary of Mattel.  Fisher-Price manufactures, markets, and distributes the Rock 'n Play Sleepers throughout the United States.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

16.     This Court has personal jurisdiction over Defendant Mattel, Inc. because Mattel conducts substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California. Mattel is registered to do business in the State of California and maintains its headquarters in the State of California.

17.     This Court has personal jurisdiction over Defendant Fisher-Price, Inc. because Fisher-Price conducts substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District, Mattel is located in this District, and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## COMMON FACTUAL ALLEGATIONS

19.     Defendants introduced the Rock 'n Play Sleepers to the U.S. market in 2009.  The Sleeper is extremely popular with parents because it rocks the baby, and

various models have other soothing features such as lullabies and vibrations. Because of these characteristics, a basic Rock 'n Play Sleeper was by far the best-selling sleeper on Amazon.com, with other Rock 'n Play Sleeper models also selling in very high numbers.[6]

20.    Inclined sleepers such as the Rock 'n Play Sleeper are sleeping products that are inclined upwards on one end to raise a baby's head and torso up to approximately 30 degrees. As initially reported in a November 26, 2018 Wall Street Journal article entitled *Infant Deaths Prompt Questions Over Safety of Inclined Sleepers*, at least 30 infant deaths and more than 700 injuries associated with these inclined sleepers – including, predominantly, the Rock 'n Play Sleeper – have been reported to the Consumer Product Safety Commission ("CPSC") since 2005.[7] More than half of these reported deaths have occurred since September 2016.[8] As Defendants belatedly acknowledged in the April 12, 2019 Recall notice, they are aware that at least 32 infants have died in the Rock 'n Play Sleeper since 2009.

21.    Defendants, who designed, manufactured, marketed and sold the Rock 'n Play Sleeper, which is one of the most popular inclined sleepers in the United States, have known of the risks posed by the product throughout the time they designed, manufactured, marketed and sold the Rock 'n Play Sleeper. They, nonetheless, continued to market them for a decade as safe environments for prolonged sleep for infants, placing millions of infants at risk.

22.    A critical common design element of the Rock 'n Play Sleeper is a collapsible frame that supports a fabric hammock with tall sides, forcing the infant into a reclined position, with the head elevated at an approximately 30-degree angle

---

[6] https://www.amazon.com/Fisher-Price-Auto-Rock-Sleeper-Stone/dp/B00NEO5UTU?th=1 (last visited Feb. 12, 2019).

[7] Voight, H. Infant Deaths Prompt Questions Over Safety of Inclined Sleepers, Wall Street Journal, Nov. 26, 2018, at A-3; see also Voight, H., Infant Sleep Deaths in Focus in Fight over Role of Consumer Safety Agency, Wall Street Journal, Nov. 23, 2018, available at https://www.wsj.com/articles/infant-sleep-deaths-in-focus-in-fight-over-role-of-consumer-safety-agency-1542974400 (last visited Apr. 23, 2019).

[8] *Id.*

from the lowest part of the baby's torso and restraints that, if used as Defendants recommend, limit the baby's motion at the hips and waist.  There is a hard-plastic shell inside the hammock that is covered with soft padded material upon which the baby is placed.  The different models of the product share this same basic design.

23.    The Rock 'n Play Sleeper does not allow the baby to sleep in a supine position, as recommended by infant sleep safety experts, and is obviously not flat. Therefore, it does not comply with the guidelines promulgated by infant sleep experts and medical professionals that a firm mattress, covered by a sheet, is the safest sleeping environment for infants.

24.    Despite knowing that the Rock 'n Play Sleeper is unsafe for overnight or prolonged sleep for infants, Defendants marketed and sold the product as a sleeper, leading parents to reasonably believe that the product is safe for its stated purpose. The words "sleeper" and "sleep" appear no fewer than five times on the package, which depicts pictures of a mom blissfully sleeping or about to fall asleep with the baby in the Rock 'n Play Sleeper.

**I.  Infant Safety And Warnings To Defendants**

25.    In 1992, before Defendants introduced the Sleeper to the U.S. market, the American Academy of Pediatrics ("AAP") released its recommendation that babies should be placed on their backs to sleep.  Subsequently, while deaths from sudden infant death syndrome (SIDS) decreased, infant deaths from other causes including suffocation, entrapment, and asphyxia did not.

26.    In October 2011, the AAP issued an updated Policy Statement, which expanded the guidelines and recommendations on safe sleep for babies.[9]  The recommendations stated:

- Infants should be placed "back to sleep for every sleep" in the supine position, wholly on his or her back.  "The supine sleeping position does

---

[9] https://pediatrics.aappublications.org/content/128/5/1030 (last visited Apr. 23, 2019).

not increase the risk of choking and aspiration in infants, even those with gastro-esophageal reflux."

- "Elevating the head of the infant's crib while the infant is supine is not recommended.  It is ineffective in reducing gastroesophageal reflux; in addition, it might result in the infant sliding to the foot of the crib into a position that might compromise respiration."

- "Although data to make specific recommendations as to when it is safe for infants to sleep in the prone or side position are lacking, studies that have established prone and side sleeping as risk factors for SIDS include infants up to 1 year of age. Therefore, infants should continue to be placed supine until 1 year of age. Once an infant can roll from supine to prone and from prone to supine, the infant can be allowed to remain in the sleep position that he or she assumes."

- "Use a firm sleep surface—A firm crib mattress, covered by a fitted sheet, is the recommended sleeping surface to reduce the risk of SIDS and suffocation."

- "A crib, bassinet, or portable crib/play yard that conforms to the safety standards of the Consumer Product Safety Commission…is recommended."

- "Soft materials…should not be placed under a sleeping infant."

- "Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep in the hospital or at home.  Infants who are younger than 4 months are particularly at risk, because they might assume positions that can create risk of suffocation or airway obstruction."

27.    In November 2016, the AAP issued a further Policy Statement reaffirming and further developing the guidelines and recommendations on safe

sleep for babies.[10]  The recommendations included many of those listed above, including, but not limited to:

- "Recommendations for a safe sleep environment include supine positioning, the use of a firm sleep surface…and the avoidance of soft bedding."
- "[M]anufacturers should follow safe sleep guidelines in their messaging and advertising."
- Infants "should be placed for sleep in a supine position" until the child reaches 1 year of age.
- "Infants should be placed on a firm sleep surface (e.g., mattress in a safety-approved crib) covered by a fitted sheet with no other bedding or soft objects to reduce the risk of SIDS and suffocation."
- "A firm surface maintains its shape and will not indent or conform to the shape of the infant's head when the infant is placed on the surface. Soft mattresses, including those made from memory foam, could create a pocket (or indentation) and increase the chance of rebreathing or suffocation if the infant is placed in or rolls over to the prone position."

28.    Defendants knew that the only safe sleep environment for babies is a firm flat surface with no soft materials, and that car seats, infant carriers, and similar devices should not be used for prolonged sleep.  Despite being warned that "manufacturers should follow safe sleep guidelines in their messaging and advertising" and "advertising messages contrary to safe sleep recommendations may create misinformation about safe sleep practices," Defendants marketed and sold the unsafe Rock 'n Play Sleeper, which positions infants for overnight sleep at a significant incline (as in a car seat), in restraints, and on soft padded material, as a suitable sleeping environment for infants.

---

[10] https://pediatrics.aappublications.org/content/138/5/e20162938 (last visited Apr. 23, 2018).

29.    Pediatricians have also warned Defendants about the dangers of the Sleeper.  In 2012, Dr. Natasha Burgert, a pediatrician, wrote an open letter to Fisher-Price[11] detailing the apparent dangers and risks inherent in a Rock 'n Play Sleeper:

> As a pediatrician and parent consumer, I believe it irresponsible to promote the Rock n' Play™ Sleeper as a safe, overnight sleeping option for infants. By continuing to do so, you are putting babies at risk.
>
> The Rock n' Play™ Sleeper should not be used for extended, unobserved infant sleep for the following reasons. First, design features of this product are known to increase the risk of sudden infant death syndrome (SIDS). Second, I have personally seen infants with brachycephaly/plagiocephaly and torticollis as a direct result of using this product. Finally, infants are often left with poor sleep habits that continue long beyond the product's use.
>
> **1. The Rock n' Play™ Sleeper is not a safe place for overnight, unobserved infant sleep.**
> The current American Academy of Pediatrics (AAP) guidelines for the prevention of SIDS includes placing baby on a firm sleep surface without extra padding, pillows, or loose items. The Rock and Play™ Sleeper does not adhere to these guidelines. Specifically, the bottom is not firm. And, some models include padded inserts that can move and shift during sleep.
>
> In my opinion, this product is a portable infant seat with attached sides, and should be categorized and marketed as such. I am concerned that infants in the "sleeper" may be at risk of asphyxiation or suffocation if continued to be used as a place for overnight, unobserved infant sleep.
>
> **2. The Rock n' Play™ Sleeper puts infants at risk for deformities.**
>
> When an infant is placed in a sleep environment as suggested by the AAP, infants are allowed natural body movements during sleep. They are able to freely move their head from side to side, and move their arms and legs to achieve different comfort positions throughout the night.
> As a consequence to babies being restricted to one sleep position for multiple hours per day, infants using the Rock n' Play™ Sleeper are developing plagiocephaly/brachycephaly ("flat head") and torticollis. These are significant

---
[11] https://www.kckidsdoc.com/kc-kids-doc/dear-fisher-price (last visited Apr. 23, 2019).

diagnoses potentially requiring expensive head-molding helmets and physical therapy.

My observational experience is not unique. There are currently numerous complaints online that should not be ignored. For example, one mother writes:

We were finally referred to a specialist because we kept voicing our concerns with our pediatrician and it turns out our son was diagnosed with severe brachycephaly and moderate plagiocephaly. We are now getting him fitted for a $3,800 helmet that he'll have to wear 23 hrs each day. He also has torticollis, which is the tightening of the neck muscles, caused by the way he favored one side in the sleeper. He has to do daily stretches which he hates, but hopefully he won't need physical therapy. I truly believe that this sleeper caused these problems and I would NOT recommend this product to anyone...it's just not worth the risk.

-From Product Review on Amazon.com

Frequent tummy time during waking hours, and holding babies in upright positions during play time, are not enough to counter the negative effects in head and body positioning that 16 hours a day in this product will produce.

Lying on a flat, firm surface is a better option for healthy development of our infants; and should be preferred to the physically restrictive, overnight sleep in the Rock n' Play™ Sleeper.

**3. The Rock n' Play™ Sleeper hinders the development of infant sleep habits.**
Learning good nighttime habits, including the ability to self-soothe, is a significant part of a child's growth and development. Patterns surrounding the sleep environment begin at very early ages. Specifically, foundational patterns of sleep-initiation, environmental experience, and nighttime expectations often begin to be established by 4 months of age.

 In my experience, parents who have used the Rock n' Play™ Sleeper face unexpected challenges once their baby outgrows this space. Families are suffering from many sleepless nights while their older infant re-learns how to sleep, on their backs, in their long-term sleep environment.

Due to the risk of injury and deformity when using the Rock n' Play™ Sleeper; I am encouraging my patient families who have an affected infant, as

a result of using this product as marketed, to add to the existing complaints on the Consumer Product Safety Commission website.

Fisher-Price®, your long-lived credible name is trusted by the general public. I am asking you, therefore, to consider re-marketing the Rock n' Play™ Sleeper as a comfortable, portable infant seat; to be used for observed play, and as a temporary place for brief rest.

This action would be consistent with your reputation as a leader in children's products, and as a corporation having the best interest of our children at the heart of your mission.

Sincerely,

Natasha Burgert, MD

30.     Defendants were also warned by Australian and Canadian agencies that their products were unsafe.  In March 2011, the Queensland Government Office of Fair Trading wrote to Defendants' affiliate in Australia regarding its concerns about the Rock 'n Play Sleeper. The Queensland Government Office of Fair Trading was concerned that Defendants' promotion of the Rock 'n Play Sleeper as an appropriate sleeping environment was at odds with widely accepted best practices (consistent with AAP guidelines) that this type of product should not be used as an infant bedding alternative, and refused to allow Defendants to sell the product in Australia unless all references to prolonged or all night sleeping were deleted.  In March 2011, Defendants' affiliate in Australia provided new box graphics to the Queensland Fair Trading Office eliminating references to overnight sleeping and proposing to call the product a "Soother" instead of a "Sleeper."  Ultimately, Defendants decided, rather than to change their marketing, to withdraw the product from sale in Australia.

31.     Similarly, in February 2011, Health Canada, the federal department of the Canadian government responsible for national health, wrote to Defendants' affiliate in Canada regarding its concerns that the Rock 'n Play Sleeper failed to comply with recommendations by Health Canada, the Public Health Agency of

Canada and the Canadian Pediatric Society that babies sleep on a firm and flat surface (consistent with AAP guidelines). According to Consumer Reports, the Rock 'n Play is available in Canada but is not called a "sleeper." Defendants market and sell it in Canada as the "Rock 'n Play Soothing Seat."

32.    In addition, in March of 2011, the Mattel Product Integrity Quality and Safety Operating Procedure was revised to advise parents that the Rock 'n Play Sleeper was "not intended to replace a crib or bassinet for prolonged sleep." This language was removed from the Mattel Product Integrity Quality and Safety Operating Procedure later in 2011.[12]

33.    Despite all of these warnings, Defendants continue to sell, market, manufacture, and distribute the Sleepers in the U.S. as an overnight sleeper. Despite the warnings described herein, Defendants did not change the package, the user manual, or any of their marketing materials to disclose that the Rock 'n Play Sleeper should not be used for prolonged sleep and thereby knowingly exposed babies to the grave risk of death, injury, and developing skull deformities.

34.    Unfortunately, as state above, in November 2018, the Wall Street Journal reported that more than 30 deaths and 700 injuries have occurred as a result of the use of inclined sleepers like the Rock 'n Play Sleeper. The specific details of these stories are terrifying and are well-known to Defendants. As a result of several of these incidents, Defendants have been the subject of numerous lawsuits.

## II.    The Inadequate and Belated Recall

35.    As set forth above, on April 12, 2019, after at least 32 infants died, hundreds more were injured, and at least 4.7 million more were exposed to risk of death, Defendants finally recalled the Rock 'n Play (the "Recall"). As noted above, in the recall notice, Defendants stated:

---

[12] See Expert Report of William F. Kitzes, J.D., dated September 30, 2016, at 6, 7, submitted in Torres et al. v. Imperial Manufactory Ltd., et al. (S.D. Texas, Civ. No. 15-444).

> *Infant fatalities have occurred in Rock 'n Play Sleepers, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances.*[13]

(Emphasis added).  Defendants advised, "[i]f you own a Rock 'n Play Sleeper, discontinue use of the item immediately."

36.    It is well known that product recalls generally have a low level of participation.  This one is designed to be no different.  Defendants' Recall is cumbersome, inconvenient, restrictive, and confusing to the general public.  Parents who own the product must take it apart and send in the hub assemblies that held parts of the product together.  Parents who had the product for six months or less are eligible for a full refund, while parents who have owned it for longer than six months are only entitled to vouchers for a selection of Fisher-Price products determined by Defendants' based on how long they have owned the Rock 'n Play.

37.    The Recall is unfair to consumers and limits full reimbursement to those who owned the product for six months or less.  Furthermore, vouchers are unacceptable because they require consumers to purchase more goods from Defendants, and thus Defendants benefit from the Recall and are rewarded for their bad behavior.

38.    Defendants have been on notice of the risks associated with the Sleepers for years and did nothing about it.  They should not now be able to profit from unconscionable behavior.  The Recall was done so that Defendant could claim it did the right thing in response to the risks associated with the Sleepers, when in fact the recall was calculated to protect Defendants' profits by ensuring as few returns as possible.

### III.   Defendants' Deceptive Advertising and Marketing

39.    Despite their indisputable knowledge of the AAP's guidelines, individual physicians' and consumer groups' recommendations that babies sleep

---

[13] https://service.mattel.com/us/recall/BJD57_ivr.asp (last visited Apr. 14, 2019).

supine, that their heads not be elevated, that they sleep on a firm surface without soft materials, and that sitting devices such as car seats, strollers, swings, infant carriers and infant slings are not recommended for routine sleep, the products being banned as "sleepers" in Australia and Canada, and the numerous reports of injury and even death, Defendants have marketed and continued, until April 12, 2019, to market the Rock 'n Play Sleeper in the U.S. as suitable for all night sleep for babies.

40.    Defendants' deceptive advertising of the Rock 'n Play Sleeper as suitable for overnight sleep for babies takes two primary forms: online and in-store. Online advertising appeared on the Fisher-Price website as well as other websites where the product was sold (such as Amazon.com). In-store advertising appeared in the numerous stores where the Rock 'n Play Sleeper was sold.

41.    Defendants' deceptive advertising of the Rock 'n Play Sleeper starts with its very name: "Sleeper." By naming the product a "Sleeper," Defendants misled consumers into believing that the product is a safe and suitable place for babies to sleep. A reasonable consumer would assume the Rock 'n Play Sleeper's design is consistent with the applicable guidelines and recommendations about how babies should be safely placed to sleep. As described above, the product actually is unfit for use as an infant sleeper.

42.    Furthermore, the marketing statements on the packaging conflict with the AAP's guidelines and recommendations, and those of other infant sleep experts.

43.    For example, Defendants' statements that "Baby can sleep at a comfortable incline all night long!", "Comfortable incline for babies that need it", and "Incline or Recline – Choose the position that baby likes best" are contrary to the AAP's guidelines and recommendations that babies sleep supine and that their heads not be elevated.

44.    Defendants' statement that "Extra-plush fabrics for extra-comfy sleep" is contrary to the AAP's guideline and recommendation that soft materials should not be placed under a sleeping infant.

45.    Defendants' statements that the product is a "Nighttime sleeper and playtime seat!" and an "Adjustable seat for all-night sleep!" is contrary to the AAP's guideline and recommendation that sitting devices are not recommended for routine sleep.  Similar statements appeared on all of Defendants' packaging for the Rock 'n Play Sleeper at all relevant times.

46.    Defendants' deceptive marketing of the product as a "Sleeper" for overnight or prolonged sleep is material to consumers' decision to purchase and/or own the product, because it causes consumers to reasonably believe the product is safe.  Defendants should not have marketed, and should not be marketing, the product as a "Sleeper" suitable for overnight sleep.  Alternatively, Defendants should have disclosed, and should disclose, in their marketing statements that using the product for overnight sleep is dangerous and contrary to medical guidelines and recommendations because this information would be material to a consumer's decision as to whether to purchase and/or own the product.

47.    However, Defendants' deceptive marketing of the Rock 'n Play Sleeper as a "Sleeper" when its use as such conflicts with the applicable medical guidelines and recommendations not only exposed Class members' infants to serious risk of injury and even death, but it also induced consumers who would not have otherwise purchased the product to purchase it, to own and use it when they would not have otherwise owned and used it, and/or to pay a higher price than they would have otherwise paid for the product were it not false or misleadingly advertised.

48.    Defendants' marketing on the Fisher-Price.mattel.com website also conflicts with the AAP's guidelines and recommendations, touting the Rock 'n Play Sleeper as a "Nighttime sleeper and playtime seat in one!  This inclined sleeper rocks!  The supportive, angled seat back keeps baby elevated for playtime and inclined sleep (the way some babies sleep best!), to help baby sleep allllll night long."

49.    Other retailers also advertise the Rock 'n Play Sleeper for prolonged infant sleep and all night use.  These webpages show pictures of mothers lying down in bed with their babies in Rock 'n Play Sleepers next to them, which indicates that mothers can sleep while their babies sleep in the product.  These statements and images are misleading for the same reasons the images on the boxes are misleading.

50.    Defendants' marketing has led consumers of Rock 'n Play Sleepers to reasonably believe that the products have been tested, comply with all applicable regulations and laws, and are fit for their intended use.

51.    Defendants profited enormously from their failure to disclose the risks of the Rock 'n Play Sleepers to consumers, and from its affirmative statements representing the Rock 'n Play Sleepers as fit for prolonged and/or overnight infant sleep.  The only reason Defendants did not disclose the risks sooner is that they deemed making money more important than protecting customers from the dangers related to the Sleepers.

## CLASS REPRESENTATION ALLEGATIONS

52.    Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Sleepers from April 23, 2015 to the present (the "Class"). Excluded from the Class are persons who made such purchases for purpose of resale.

53.    Plaintiff also seeks to represent a subclass of all Class Members who purchased the Sleepers in the State of California (the "California Subclass").

54.    At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclass ("Class Members" and "Subclass Members," respectively); however, given the nature of the claims and the number of retail stores in the United States selling Defendants' Sleepers, Plaintiff believes that Class and Subclass members are so numerous that joinder of all members is impracticable.

55.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of

the Class that predominate over questions that may affect individual Class members include, but are not limited to:

        (a)    whether Defendants misrepresented and/or failed to disclose material facts concerning the Products;

        (b)    whether Defendants' conduct was unfair and/or deceptive;

        (c)    whether Defendants have been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon Defendants by Plaintiff and the Class;

        (d)    whether Plaintiff and the Class have sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages.

56.    Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased, in a typical consumer setting, Defendants' Sleepers, and Plaintiff sustained damages from Defendants' wrongful conduct.

57.    Plaintiff will fairly and adequately protect the interests of the Class and Subclasses and has retained counsel that is experienced in litigating complex class actions.  Plaintiff has no interests which conflict with those of the Class or the Subclass.

58.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

59.    The prosecution of separate actions by members of the Class and the Subclass would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants.  For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the Class and the Subclass even where certain Class or Subclass members are not parties to such actions.

# COUNT I

## (Fraud)

60.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

61.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

62.    This claim is based on fraudulent representations and omissions concerning the safety of consumers who use the Sleepers.  As discussed above, Defendants failed to disclose that the risks associated with the intended use of the Sleeper, or that the risks were substantially likely to manifest through the customary and intended use of the Sleepers.  Defendants also represented the Sleepers as safe for prolonged sleep, which they were not.

63.    The false and misleading representations and omissions were made with knowledge of their falsehood.  Defendants are nationwide children's product distributors who knew of reports of the Sleepers' dangerous nature.  Nonetheless, Defendants continued to sell their worthless and dangerous Sleepers to unsuspecting consumers.

64.     The false and misleading representations and omissions were made by Defendants, upon which Plaintiff and members of the proposed Class and California Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and members of the proposed Class and California Subclass to purchase the Sleepers.

65.    The fraudulent actions of Defendants caused damage to Plaintiff and members of the proposed Class and Subclass, who are entitled to damages and other legal and equitable relief as a result.

# COUNT II

## (Unjust Enrichment)

66.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

67.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

68.     Plaintiff and Class members conferred benefits on Defendants by purchasing the Sleepers.

69.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchases of the Sleepers.  Retention of those moneys under these circumstances is unjust and inequitable because Defendants failed to disclose that the Sleepers were unfit for their intended use, or that the risks were substantially likely to manifest through the customary and intended use of the Sleepers.  These omissions caused injuries to Plaintiff and Class members because they would not have purchased the Sleepers if the true facts were known.

70.     Retention of those moneys also is unjust and inequitable because, as alleged above, Defendants commenced an ineffective recall that was calculated to result in few returns, and generally no refunds, thereby protecting profits Defendants collected from selling the Sleepers.

71.     Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiff and Class members for its unjust enrichment, as ordered by the Court.

# COUNT III

## (Breach of Implied Warranty of Fitness and Merchantability)

72.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

73.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

74.    Defendants are, and at all relevant times were, a merchant engaged in the business of manufacturing and distributing, among other things, Rock 'n Play Sleepers.

75.    Plaintiff and the Class Members purchased the Sleepers.

76.    Defendants are manufacturers and merchants with respect to goods of this kind, which were sold to Plaintiff and other consumers, and there was in the sale to Plaintiff and other consumers an implied warranty that those goods were merchantable and that they were fit for their intended use as infant sleepers.

77.    However, Defendants breached that warranty implied in the contract for the sale of goods in that Rock 'n Play Sleepers are completely unusable, lack even the most basic degree of fitness for ordinary or intended use, and are not safe for human use as set forth in detail herein above.

78.    The Sleepers are defective and unusable because they were distributed to the public with extreme safety risks, and because those risks were substantially likely to manifest through the customary and intended use of the Sleepers.  As a result, the Sleepers were not usable and dangerous to the health and well-being of its consumers.

79.    Defendants admitted that the Sleepers were completely unusable and unfit for normal use when it initiated the Recall described in detail herein above.

80.    As a direct and proximate result of this breach of warranty by Defendants, Plaintiff and other consumers have been damaged by paying monies for products that are completely unusable and unfit for their intended purpose. Plaintiff seeks damages in an amount to be proven at trial for the injuries suffered from Defendants' breach of the implied warranties.  The damages suffered by Plaintiff and the Class Members include, but are not limited to, the monies paid to Defendants for the Sleepers.

81.     As a result of Defendants' conduct, Plaintiff did not receive goods as impliedly warranted by Defendants to be merchantable.

## COUNT IV
### (Breach of Express Warranty)

82.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

83.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

84.     Defendants are, and at all relevant times were, a merchant engaged in the business of manufacturing and distributing, among other things, Rock 'n Play Sleepers.  Defendants sold the Sleepers in the regular course of business and Plaintiff and Class members purchased the Sleepers.

85.     Defendants expressly warranted to all consumers that Rock 'n Play Sleepers were appropriate and safe for prolonged and/or overnight infant sleep, which became the basis of the bargain between Defendants and Plaintiff and Class members.

86.     Defendants gave these express warranties to Plaintiff and Class members in written form on the packaging of Rock 'n Play Sleepers as well as through the marketing and advertising described herein.

87.     Defendants' written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty.

88.     Defendants breached their express warranties because their representations and statements alleged herein are false and the Sleepers did not contain the properties Defendants represented.  Despite warranting the Sleepers as suitable for prolonged and/or overnight infant sleep, Defendants knew that there were risks associated with the Sleepers and failed to inform Plaintiffs and the Class members as such.

89.    By placing the Sleepers in the stream of commerce, Defendants further warranted that the Sleepers were safe to use and complied with applicable guidelines.

90.    Defendants breached their warranties because, contrary to their representations, the Sleepers are not suitable for prolonged and/or overnight infant sleep, and do not comply with applicable guidelines and recommendations for safe sleep for infants.

91.    As a direct and proximate result of this breach of warranty by Defendants, Plaintiff and other consumers have been damaged by paying monies for products that are completely unusable.  Plaintiff seeks damages in an amount to be proven at trial for the injuries suffered from Defendants' breach of express warranties.  The damages suffered by Plaintiff and the Class Members include, but are not limited to, the monies paid to Defendants for the Sleepers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a.    For an order certifying the nationwide Class and the Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Subclass members;

b.    For an order declaring the Defendants' conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff, the nationwide Class, and the Subclass on all counts asserted herein;

d.    For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.    For pre-judgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of monetary relief;

g.    For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of all issues so triable.

Dated: April 23, 2019

**BURSOR & FISHER, P.A.**

By:    */s/ Blair E. Reed*
            Blair. E. Reed

L Timothy Fisher (State Bar No. 191626)
Blair E. Reed (State Bar No.316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
            breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiff*